[No. C018430. Third Dist. May 26, 1995.]

LISA A. JENSEN, Plaintiff and Appellant, v.
BMW OF NORTH AMERICA, INC., Defendant and Appellant.

**COUNSEL**

Kemnitzer, Dickinson, Anderson & Barron and Mark F. Anderson for Plaintiff and Appellant.

Taylor & Hodges and Berta Peterson-Smith as Amici Curiae on behalf of Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, Claudia J. Robinson and Henry D. Nanjo for Defendant and Appellant.

Robert W. Beck and Kristine J. Exton as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**BROWN, J.**—Lisa A. Jensen sued BMW of North America, Inc., for willful violation of the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.)[1] and the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.). She alleged the low-mileage 1988 BMW she leased in 1989 was subject to the manufacturer's new car warranty, but BMW refused to replace the vehicle or refund her money when it could not repair defects in the braking system.

The jury returned a verdict in favor of Jensen and awarded her $29,351 in damages. It also imposed a $58,702 civil penalty against BMW. The court denied BMW's motions for judgment notwithstanding the verdict and for new trial. Plaintiff and defendant appeal.

The principal issue in BMW's appeal is whether Jensen's vehicle is a "new motor vehicle" within the meaning of section 1793.22, subdivision (e)(2). BMW also argues the court committed instructional error and supplied the jury with a defective special verdict form, Jensen's attorney committed misconduct by referring to the "Lemon Law" in examination and argument, the civil penalty authorized in section 1794, subdivision (c), is subject to a one-year limitations period, and there is insufficient evidence to support the verdict and civil penalty.

In her appeal, Jensen contends section 1794, subdivision (d), authorizes an award of expert witness fees in addition to costs. We agree and remand the case for further proceedings related to that award. We affirm the judgment in all other respects.

### FACTUAL BACKGROUND

In response to a newspaper ad for BMW demonstrators, Jensen leased a 1988 BMW 528e from Stevens Creek BMW Motorsport in Santa Clara in January 1989. The odometer read 7,565 miles at the time of the lease. The salesman told Jensen the car had been used as a demonstrator for the dealership. He also said she would get the 36,000-mile warranty on top of the miles already on the car, and gave her the warranty booklet. The dealer wrote "factory demo" on the credit application.

[1]All statutory references are to the Civil Code unless otherwise specified.

Unknown to Jensen, Stevens Creek BMW obtained the car at the Atlanta Auto Auction the month before. It had been owned by the BMW Leasing Corporation and registered in New Jersey.

The brake problem surfaced a few weeks after Jensen took delivery of the car. She was traveling between 55 and 60 miles per hour on a Bay Area freeway when the car in front of her braked suddenly. Jensen hit her brakes, and the steering wheel began to shake. She felt like "the tires were going to fall off the car."

Jensen took the car to Stevens Creek BMW for repair on March 20, 1989. The dealership was unable to locate the problem and made no repairs.

The brake shimmy recurred after Jensen moved to Auburn later in the spring of 1989. She took the car to Roseville BMW for brake repairs on five occasions between July 1989 and January 1991. During that period, the dealership replaced brake system rotors, brake pads, and other brake parts. The brake shimmy disappeared after each repair, but showed up intermittently after a few thousand miles. At trial, Chris Hearty, the service manager for Roseville BMW, acknowledged he was unable to solve the brake problem.

Jensen stopped driving the car in August 1991. She told Rolf Hanggi, BMW's district service manager, she wanted her money back or a different car. Jensen met with BMW representatives at Roseville BMW in October, November, and December 1991 to discuss the various options. Roseville BMW loaned Jensen a model 325i on a temporary basis.

At the third and final meeting in December 1991, Jensen presented a letter requesting refund of her original down payment, lease payments and other fees, or replacement of the car with credit for the original down payment and lease payments. She preferred a refund, but Hearty and Hanggi refused to discuss that option.

Instead, BMW promised to get Jensen another car under a trade assistance program. However, BMW's proposed $2,000 contribution to trade assistance did not cover the payoff on Jensen's 528e. Jensen doubted she could qualify for the same lease due to recent changes in her financial condition. Hanggi assured Jensen her creditworthiness was not an issue. Two days later Hanggi said she failed to qualify for a lease on a 325i. He offered to change the brake pads and discs again, and replace all four tires on the 528e. Jensen refused BMW's offer. Roseville BMW picked up the loaner, and Jensen returned her car to storage. She filed suit against BMW in April 1992.

At trial, BMW introduced evidence the brake shimmy was caused by Jensen's abusive driving style and her failure to maintain the vehicle. However, no one told Jensen there was a problem with her driving style or maintenance practices when she took her car to Roseville BMW for repair. Jensen produced a BMW technical service bulletin, dated October 1990, which alerted dealers about brake problems like those found in her car.

## DISCUSSION

### I

### The Song-Beverly Consumer Warranty Act

The Song-Beverly Consumer Warranty Act (the Act) represents the Legislature's response to the increasing exploitation of express warranties in product advertising. (See Comments, *Toward an End to Consumer Frustration—Making the Song-Beverly Consumer Warranty Act Work* (1974) 14 Santa Clara L.Rev. 575, 580.) If a manufacturer elects to provide an express warranty for consumer goods such as motor vehicles, the Act protects buyers in a number of ways.

The warranty must set forth its terms in "readily understood language, which shall clearly identify the party making such express warranties, . . ." (§ 1793.1, subd. (a)(1).) The manufacturer is required to maintain service and repair facilities in California. (§ 1793.2, subd. (a).) Moreover, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle, . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . ." (§ 1793.2, subd. (d)(2).)

A buyer of consumer goods who is damaged by the manufacturer's failure to comply with the Act may bring an action to recover damages. If the buyer proves the violation was willful, ". . . the judgment may include, in addition to [damages], a civil penalty which shall not exceed two times the amount of actual damages." (§ 1794, subd. (c).)

### II

### BMW's Appeal

### A. Jensen's BMW Was a "New Motor Vehicle."

Section 1793.22, subdivision (e)(2), defines a "new motor vehicle" as "a new motor vehicle which is used or bought for use primarily for personal,

family, or household purposes. *'New motor vehicle' includes the chassis, chassis cab, and that portion of a motor home devoted to its propulsion,* but does not include any portion designed, used, or maintained primarily for human habitation, *a dealer-owned vehicle and a 'demonstrator' or other motor vehicle sold with a manufacturer's new car warranty* but does not include a motorcycle or a motor vehicle which is not registered under the Vehicle Code because it is to be operated or used exclusively off the highways. A 'demonstrator' is a vehicle assigned by a dealer for the purpose of demonstrating qualities and characteristics common to vehicles of the same or similar model and type." (Italics added.)

■ At issue in BMW's appeal is the court's pretrial ruling Jensen's car came "within a new car definition and [was] entitled to new car protections of the Song-Beverly Act." Both parties and the amici curiae assert the language of the statute is clear; they disagree on its meaning.

BMW maintains section 1793.22, subdivision (e)(2) clearly describes five categories of "new motor vehicles" to include the chassis, chassis cab, the portion of a motor home devoted to propulsion, a dealer-owned vehicle, and a demonstrator. It contends the phrase "or other motor vehicle sold with a manufacturer's new car warranty" clarifies the word "demonstrator" and is not intended as a separate category. BMW says the Legislature "could not have intended for the language to mean the equivalent of *'every* motor vehicle sold with . . . any remainder of the manufacturer's new car warranty,' as such an interpretation would be detrimental to the interests of consumers." (Italics in original.)

Jensen argues the plain language of the statute sets forth six categories of "new motor vehicles." She says the Legislature intended the phrase "other motor vehicle sold with a manufacturer's new car warranty" as a "separate category of vehicle with no history of use by a manufacturer's employee, as a daily rental car or as a demonstrator."

The key to statutory interpretation is applying the seemingly plastic rules of construction in proper sequence. (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298].) First, we must examine the actual language of the statute, giving the words their ordinary, everyday meaning. (*Ibid.*) If the words are reasonably free from ambiguity and uncertainty, the language controls. (*Id.* at p. 1239; *Wingfield* v. *Fielder* (1972) 29 Cal.App.3d 209, 219 [105 Cal.Rptr. 619].) If the meaning of the words is not clear, we must take the second step and refer to the legislative history. (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra*, at p. 1239.)

"The final step—and one which we believe should only be taken when the first two steps have failed to reveal clear meaning—is to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], in accord with common sense and justice, and to avoid an absurd result [citations]." (*Id.* at pp. 1239-1240.)

We conclude the words of section 1793.22 are reasonably free from ambiguity and cars sold with a balance remaining on the manufacturer's new motor vehicle warranty are included within its definition of "new motor vehicle." The use of the word "or" in the statute indicates "demonstrator" and "other motor vehicle" are intended as alternative or separate categories of "new motor vehicle" if they are "sold with a manufacturer's new car warranty." (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].) However, because the peculiar grammatical structure of this section makes BMW's argument at least superficially plausible, we also consider the legislative history.

Having reviewed the amendments to former section 1793.2, documents relating to those legislative proceedings, and the statutory scheme as a whole, we conclude the plain meaning and the legislative intent are one and the same.

The 1982 amendment to former section 1793.2 was popularly known as the "Lemon Law." Specifically designed to deal with defective cars, the amendment applied the "repair and replace" provisions of the Act to "new motor vehicles" bought for personal rather than commercial use. (Stats. 1982, ch. 388, § 1, p. 1720.)

In 1987, the Legislature clarified the scope of former section 1793.2, subdivision (e)(4)(B), by expressly including within the definition of " 'New motor vehicle' " a "dealer-owned vehicle and a 'demonstrator' or other motor vehicle sold with a manufacturer's new car warranty" except a motorcycle, a motorhome, or an unlicensed off-road vehicle.[2] The 1987 amendment defines a demonstrator as "a vehicle assigned by a dealer for the purpose of demonstrating qualities and characteristics common to vehicles of the same or similar model and type."[3] The 1987 amendments also clarified the manufacturer's responsibility on resale of vehicles returned under the Act, i.e., "lemons," requiring the manufacturer to disclose the

---

[2]Defective used cars are addressed by a separate section of the Act. (§ 1795.5.)

[3]BMW notes the court in *Ibrahim* v. *Ford Motor Co.* (1989) 214 Cal.App.3d 878, 885, footnote 6 [263 Cal.Rptr. 64], read the 1987 amendment as adding "dealer-owned 'demonstrator' vehicles and certain portions of motorhomes."

nature of the nonconformity, correct the nonconformity, and "warrant[] to the new buyer or lessee in writing for a period of one year that the motor vehicle is free of that nonconformity." (Stats. 1987, ch. 1280, § 2, pp. 4561-4562.)

In 1988, the Legislature added "the chassis, chassis cab, [and] that portion of a motorhome devoted to its propulsion, . . . " to the list of new motor vehicles covered by the provisions of the Lemon Law. (Stats. 1988, ch. 697, § 1, p. 2319.) Effective January 1, 1993, the definition was moved without change to section 1793.22, subdivision (e)(2). (Stats. 1992, ch. 1232, § 7.)

In 1991, the Legislature closed another loophole by expanding the scope of California law to cover vehicles returned under other states' Lemon Laws: "[N]o person shall sell, *either at wholesale or retail*, lease, or transfer a motor vehicle transferred by a buyer or lessee to a manufacturer pursuant to paragraph (2) of subdivision (d) *or a similar statute of any other state,* unless the nature of the nonconformity . . . is clearly and conspicuously disclosed to the prospective buyer, lessee, or transferee, the nonconformity is corrected, and the manufacturer warrants to the new buyer, lessee or transferee in writing for a period of one year that the motor vehicle is free of that nonconformity." (Stats. 1991, ch. 689, § 10, italics added.)

These amendments show the Legislature has systematically attempted to address warranty problems unique to motor vehicles, including transferability and mobility. As this case demonstrates, there is a national wholesale market for previously owned cars, including those under manufacturers' warranty.

In support of its reading of section 1793.22, subdivision (e)(2), BMW quotes from the 1987 Department of Consumer Affairs, Enrolled Bill Report: "This bill includes within the protection of the lemon law dealer-owned vehicles and 'demonstrator' vehicles sold with a manufacturer's new car warranty." (See Dept. Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 2057 (Sept. 25, 1987) p. 5.)

Without citing authority in support of the proposition, BMW also contends the *absence* of legislative history means the Legislature did not intend to enact so sweeping an expansion in the warranty protection available under the Act. It says "[i]t is inconceivable that the manufacturers would have supported or remained neutral on the [1987] bill if the definition of 'new motor vehicle' had been expanded in the manner found by the lower court here."

We reject this contention. It is difficult enough to derive legislative intent from statements *actually made* in documents associated with the legislative

process. As the court observed in *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.*, *supra*, "[The language of the statute] has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' " (6 Cal.App.4th at p. 1238.) Given the nature of the process, we conclude no inference of legislative intent may be drawn from the lack of legislative history on this particular statutory provision.

Next, BMW argues the trial court's interpretation of the Act's definition of a "new motor vehicle" creates an "untenable conflict" with the general definitions of new and used vehicles found in Vehicle Code sections 430 and 665,[4] a result to be avoided in statutory construction. Whether a specific statute supplants a general statute is a question of legislative intent. Absent an express declaration, the legislative intent is evidenced by whether the two statutes deal with the same subject matter. (*People* v. *Hopkins* (1978) 78 Cal.App.3d 316, 319 [142 Cal.Rptr. 572]; see, e.g., *Gilbert* v. *Municipal Court* (1977) 73 Cal.App.3d 723, 726-727 [140 Cal.Rptr. 897] [different legislative intent found where one statute addressed illicit drug use and the other addressed dangerous driving].) .

The Vehicle Code definitions of new and used vehicles apply to the entire code, including regulation of vehicle sales, registration, and operation. (Veh. Code, § 100.) The Act deals with significantly different subject matter— consumer protection through enforcement of express warranties. Accordingly, we find no inherent conflict given the different subject matter and statutory purposes.

---

[4]Former Vehicle Code section 430, cited by BMW, defined "new vehicle" as "a vehicle constructed entirely from new parts that has never been sold and operated, or registered with the department, or registered with the appropriate agency of authority, or sold and operated upon the highways of any other state, District of Columbia, territory or possession of the Untied States, or foreign state, province, or country. . . ." The Legislature amended section 430 in 1994 to read: "A 'new vehicle' is a vehicle constructed entirely from new parts that has never been the subject of a retail sale, or registered with the department, or registered with the appropriate agency or authority of any other state, District of Columbia, territory or possession of the United States, or foreign state, province, or country."

Vehicle Code section 665 defines "used vehicle" as "a vehicle that has been sold, or has been registered with the department, or has been sold and operated upon the highways, or has been registered with the appropriate agency of authority, of any other state, District of Columbia, territory or possession of the United States or foreign state, province or country, or unregistered vehicles regularly used or operated as demonstrators in the sales work of a dealer or unregistered vehicles regularly used or operated by a manufacturer in the sales or distribution work of such manufacturer. . . ."

BMW also argues the trial court's construction of the section 1793.22 definition of "new motor vehicles" to include used cars conflicts with the definition of "consumer goods" found in section 1791, subdivision (a).[5] The definition of "consumer goods" as "new products" dates back to 1971. (Stats. 1971, ch. 1523, § 2, p. 3001.) The Legislature added the more specific definition of "new motor vehicle" to former section 1793.2 in 1987. (Stats. 1987, ch. 1280, § 2, p. 4561.) Under well-recognized rules of statutory construction, the more specific definition found in the current section 1793.22 governs the more general definition found in section 1791. (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172].)

Our conclusion section 1793.22 includes cars sold with a balance remaining on the new motor vehicle warranty is consistent with the Act's purpose as a remedial measure. (*Kwan* v. *Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].) It is also consistent with the Department of Consumer Affairs' regulations which interpret the Act to protect "any individual to whom the vehicle is transferred during the duration of a written warranty." (Cal. Code Regs., tit. 16, § 3396.1, subd. (g).)

Addressing the final step in statutory construction which applies reason, practicality, and common sense to the language in question (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra*, 6 Cal.App.4th at p. 1239), BMW argues the Legislature could not have intended to grant protection to every used car with a balance remaining on the new car warranty because of the economic impact on consumers. Specifically BMW maintains "[t]he subsequent owner would have the benefit of all of Song-Beverly's generous presumptions, without having undertaken the same risks as the purchaser of a really new car. Further, while the subsequent purchaser (perhaps third or fourth in the line of owners) will receive the benefit of these presumptions, the manufacturer will find it tremendously more difficult to raise defenses under Song-Beverly—such as the defense that the owner used the vehicle unreasonably—because it will be harder to trace multiple owners and determine their use or abuse of the vehicle." BMW contends the increased costs will result in higher car prices or the shortening of warranties to the statutory minimum. It argues "[t]hese alternatives would inevitably result in a manifest decline in trade and commerce in this state, creating great inconvenience

---

[5]Under that provision, "consumer goods" means "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables. 'Consumer goods' shall include new and used assistive devices sold at retail."

for consumers. It is impossible that the legislature intended this highly intractable result."[6]

We acknowledge manufacturers such as BMW incur costs in honoring express warranties to service and repair the cars they sell in this state. We also presume the decision to offer a warranty of a specified length involves weighing the benefit of increased sales against the cost of providing service and repair for the effective duration of the warranty. It may be the equation factors in the impact of resale during the warranty period. However, as noted by BMW, manufacturers are free to change the terms of express warranties they offer. The Act merely reflects the Legislature's intent to make car manufacturers live up to their express warranties, whatever the duration of coverage.

## B. *Jensen Had a Cause of Action Against BMW.*

Turning from the definition of "new motor vehicle," BMW argues Jensen had no cause of action against BMW because, pursuant to section 1795.5, an express warranty made by the dealer on a used vehicle does not impose liability on a manufacturer. It argues there was no privity between BMW and Jensen even if the car were viewed as a new vehicle under the Act. BMW maintains it made no representations to Jensen that she was covered by the remainder of the new car warranty. Jensen knew she was buying a used car "in spite of the fact that sales personnel of the leasing dealer apparently represented to [her] that the unexpired portion of the manufacturer's original limited warranty would be applicable to the vehicle." We reject this argument for two reasons.

First, the Act applies to new motor vehicle manufacturers who make express warranties. (§§ 1791.2 and 1793.2.) There is no privity requirement.

---

[6]Amici curiae in support of BMW cite lemon laws in Connecticut, New York, and Wyoming which apply new vehicle protections to previously owned vehicles. Connecticut law covers "any person to whom [a] motor vehicle is transferred during the duration of an express warranty applicable to such motor vehicle." (Conn. Gen. Stat. § 42-179, subd. (a)(1).) New York recently amended its consumer warranty statutes to provide a right of action against the manufacturer where the motor vehicle was "subject to a manufacturer's express warranty at the time of original delivery and either (i) was purchased, leased or transferred in this state within either the first eighteen thousand miles of operation or two years from the date of original delivery, whichever is earlier, or (ii) is registered in this state." (N.Y. Gen. Bus. Law, § 198-a.) Wyoming's definition of a "consumer" includes any person "[t]o whom a motor vehicle is transferred during the term of an express warranty applicable to the motor vehicle." (Wyo. Stat. § 40-17-101.) However, neither BMW nor its amici curiae provide examples of consequences adverse to the manufacturers in states such as these where consumer warranty law provides coverage for previously owned vehicles still subject to the original manufacturer's warranty.

Second, to the extent BMW's argument challenges the jury's implied factual finding that Jensen's vehicle was covered by BMW's express written warranty, we conclude the record supports that finding. The leasing dealer told Jensen she would receive the 36,000-mile warranty on top of the miles that were on the car. The salesman gave her a copy of BMW's warranty. Moreover, the word "WARRANTY" appeared prominently on Roseville BMW's repair orders. According to Hearty, the service manager, the dealership typically noted occasions when repairs were made for purposes of good will. No such notation appeared on the repair orders relating to Jensen's brakes. The jury apparently rejected testimony BMW provided Jensen warranty repair as a gesture of good will.

### C. There Was No Instructional Error.

■ BMW argues the court erred in failing to read a portion of the civil penalty instruction and in rejecting proposed instructions on the burden of proof and warranty rights of lessees of used cars.

The court orally gave the jury a lengthy instruction on civil penalty which listed factors the jury could consider in determining whether BMW's decision "not to replace the vehicle or refund the purchase price was based upon a good faith and reasonable belief that the facts imposing such an obligation to replace or refund were not present in this case." The court inadvertently omitted one of the factors contained in the written instruction which read: "Whether BMW of North America reasonably believed that the vehicle conformed to the applicable express warranty and that there were no unresolved problems with the vehicle." When the omission was called to the court's attention, it directed the jury to go over page 45 of the written instructions (which had been provided to the jury), the 2d page of the civil penalty instruction.

We conclude BMW suffered no prejudice from the court's omission. Alerted to its possible mistake, the court immediately directed the jury to a specific page in the written instructions. We presume the jury followed the court's instruction to review the civil penalty instruction carefully. (See *People* v. *Harris* (1994) 9 Cal.4th 407, 426 [37 Cal.Rptr.2d 200, 886 P.2d 1193].)

The court rejected an instruction proposed by BMW concerning the warranty rights of lessees of used vehicles leased from a dealer with the balance of a manufacturer's new car warranty. BMW argues the instruction "would have correctly informed the jury that a manufacturer cannot be held liable under Song-Beverly unless it is first established that [the consumer]

had leased a *new* motor vehicle." (Italics in original.) Inasmuch as the court ruled *in limine* that Jensen's car was "entitled to new car protections of the Song-Beverly Act," we conclude the court properly refused the proffered instruction.

We also reject the contention the court erred in refusing BMW's instruction on the burden of proof of breach of express warranty and in giving "an overgeneralized and inaccurate instruction substantially identical to that proposed by [Jensen]."[7] At the close of discussions on jury instructions, BMW renewed its argument that Jensen's car was a used motor vehicle. Having stated that objection and two other objections not relevant to this appeal, BMW stipulated that the final set of instructions was given "with the mutual agreement of both sides as to what [was] given and what [was] not given, . . ." On appeal, BMW complains the burden of proof instruction read by the court: (1) "failed to mention that [Jensen] must first prove by a preponderance of the evidence that she was the lessee of a 'new motor vehicle'", (2) did not indicate Jensen was required to prove BMW actually breached the express warranty before notifying the manufacturer of the breach; and (3) failed to include the obvious requirement that any breach of warranty must have occurred within the applicable warranty period.

As we stated, the court's *in limine* ruling resolved the legal question whether Jensen's car was a "new motor vehicle" for purposes of the Act. The court properly refused an instruction which presented that issue to the jury. BMW's stipulation waived its remaining complaints about the burden of proof instruction. For these reasons, we conclude the court did not err in refusing BMW's express warranty instruction.

D. *References to the "Lemon Law" Did Not Constitute Misconduct.*

■ Before trial, the court granted BMW's motion to exclude reference to the term "Lemon Law" or "lemon" in describing the litigation or Jensen's vehicle. However, Jensen used the term "Lemon Law" in response to a question on direct examination. Her attorney used the term on three occasions during cross-examination. He also referred to "Lemon Law" 11 times in closing argument. The record includes no reference to Jensen's car being

---

[7]The court instructed the jury: "In this action the plaintiff has the burden of establishing by a preponderance of the evidence the following facts in order to prove a breach of express warranty under the Song-Beverly Consumer Warranty Act: [¶] First, that plaintiff leased a vehicle covered by the manufacturer's new car warranty. [¶] Second, that the manufacturer gave the plaintiff an express written warranty, and the written warranty covered the nonconformity plaintiff alleges existed in the vehicle. [¶] Third, that the plaintiff notified the manufacturer that there was a breach of warranty. [¶] Fourth, that the manufacturer directly or through their authorized dealers failed to conform the vehicle to the express warranty after a reasonable number of attempts. [¶] And fifth, the nature and extent of palintiff's damages."

a "lemon." BMW did not object to the use of the term "Lemon Law" by Jensen or her attorney.

BMW unsuccessfully raised the issue of attorney misconduct in its motion for new trial. The court did not find the references to "Lemon Law" an abuse of its *in limine* order and decided the alleged misconduct was insufficient to warrant a new trial. We conclude there was no error in this ruling because BMW failed to object to the use of the term at trial. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 798 [174 Cal.Rptr. 348].)

Misconduct of counsel in argument may not be raised on appeal absent a timely objection and request for admonition during trial *unless* the misconduct was too serious to be cured. (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d at p. 797; 7 Witkin Cal. Procedure (3d ed. 1985) Trial, §§ 207 and 209, pp. 209 and 211.) We decline BMW's invitation to excuse its failure to object.

First, although the court granted BMW's *in limine* motion regarding use of the term "Lemon Law" during trial, the Act is commonly referred to as the "Lemon Law." (See, e.g., *Ibrahim* v. *Ford Motor Co., supra,* 214 Cal.App.3d 878, 882.) We are unpersuaded by the suggestion the term is inflammatory and prejudicial when used interchangeably with the name of the Act.

Second, we reject BMW's assertion it would have been futile to object to the use of the term by Jensen's attorney because the "proverbial bell had been rung." On this record there is no reason to conclude a timely objection and admonition would have been ineffective to cure whatever harm occurred, and, more importantly, to prevent further reference to what BMW considered an inflammatory term.

E.   *The Special Verdict Form Was Not Defective.*

"In all cases the court may direct the jury to find a special verdict in writing, upon all, or any of the issues, . . ." (Code Civ. Proc., § 625.) "The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

In this case, the court gave the jury a special verdict form which asked three questions:

"1.   What is the total amount, if any, of actual damage suffered by plaintiff, less any amount directly attributable either to use by plaintiff prior to the discovery of the nonconformity or use by plaintiff after the date of her effective revocation of acceptance of the vehicle?

"..................................

"2. Do you find that defendant BMW of North America, Inc., willfully failed to meet its obligations under the Song-Beverly Warranty Act? Yes ____ No ____

"3. If answer to question No. 2 is 'yes,' what amount do you award as a civil penalty (limited to a maximum of two times the amount specified in answer No. 1): _____ "

██ BMW challenged the special verdict form in its motion for new trial on the ground it failed to submit for jury resolution the primary issue of BMW's liability under the Act. BMW argued the special verdict should have included the question, "Did defendant violate the Song-Beverly Warranty Act?" Counsel for BMW submitted a declaration stating he believed the court determined that the verdict form would begin with that question. He also stated the court clerk typed the final version of the special verdict form and neither counsel was given an opportunity to review it before it was submitted to the jury.

The court rejected BMW's challenge on grounds the parties approved the special verdict form and the form was not prejudicially defective. We conclude the court did not err in denying BMW's motion.

Without considering the effect of the stipulation, BMW waived any objection to the special verdict form by failing to object before the court discharged the jury. (*Woodcock* v. *Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 [72 Cal.Rptr. 217, 445 P.2d 881].) BMW's counsel acknowledged he learned of the alleged defect in the special verdict form for the first time when the verdict was read. His declaration does not explain the reason he did not object at that stage in the proceedings—when the court could have corrected any defect in the form and sent the jury back to complete its deliberations.

In any event, the omission of a specific question on whether BMW violated the Act is not fatal to the validity of the verdict. The case went to trial on the first, second, and fifth causes of action involving violation of the Act and its federal counterpart. The court instructed the jury it could award various items of damage "[i]f under the court's instructions, [it found] the plaintiff [was] entitled to a verdict against the defendant, . . ." In this context, the words "if any" in the first question of the special verdict form plainly indicate the jury was free to find no damage if it found BMW did not violate the Act. A finding of $29,351 in damages presupposes BMW's failure to comply with its statutory obligations. Moreover, the response

"yes" to the second question indicates the jury concluded BMW not only violated the Act, but violated it willfully. The special verdict would have been ambiguous on the question of BMW's simple violation of the Act if the jury had responded "no" to the second question.

### F.   *The Civil Penalty Is Not Time Barred.*

BMW argues the civil penalty under section 1794, subdivision (c),[8] is barred by Code of Civil Procedure section 340, subdivision (1), which establishes a one-year limitations period for "[a]n action upon a statute for a penalty or forfeiture, when the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation." An action for damages under the Act is governed by the four-year limitations period for breach of warranty in sales contracts set forth in California Uniform Commercial Code section 2725.[9] (*Krieger* v. *Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 211 [285 Cal.Rptr. 717].)

BMW challenges the limitations period for the civil penalty provisions of the Act for the first time on appeal, claiming the issue is a question of law involving uncontradicted facts.   Ordinarily, an appellate court will not consider procedural defects or erroneous rulings in connection with affirmative defenses "where an objection could have been, but was not, presented to the lower court by some appropriate method." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 311, p. 321.) As BMW notes, there is an exception to the general rule "where the theory presented for the first time on appeal involves only a legal question determinable from facts which not only are uncontroverted in the record, but which could not be altered by the presentation of additional evidence." (*Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].) Application of the general rule is a matter left to the appellate court's discretion. (*Ibid.*)

---

[8]Section 1794, subdivision (c), provides: "If the buyer establishes that the failure to comply was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages. This subdivision shall not apply in any class action under Section 382 of the Code of Civil Procedure or under Section 1781, or with respect to a claim based solely on a breach of an implied warranty."

[9]California Uniform Commercial Code section 2725 reads in part: "(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . . [¶] (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

Here, there are conflicting inferences regarding the date the action accrued under the Act. BMW claims Jensen discovered the breach of express warranty in mid-1990 when she wrote BMW about the recurring brake problem. Jensen argues her right to a civil penalty accrued in December 1991 when BMW refused to provide reimbursement or replacement. We exercise our discretion to address the limitations question because under either factual scenario, the civil penalty would be available under the four-year limitations period found in California Uniform Commercial Code section 2725 and barred by the one-year limitations period of Code of Civil Procedure section 340, subdivision (1).

We conclude the discretionary civil penalty under section 1794, subdivision (c), is governed by the four-year limitations period of California Uniform Commercial Code section 2725. Code of Civil Procedure section 340, subdivision (1), applies only where the penalty is mandatory. (*Menefee v. Ostawari* (1991) 228 Cal.App.3d 239, 243 [278 Cal.Rptr. 805].) If the one-year limitations period applied to discretionary penalties, a plaintiff would be placed in the untenable position of being unable to determine the applicable statute of limitations until after trial, when the court determined whether to allow up to double damages. (*Holland* v. *Nelson* (1970) 5 Cal.App.3d 308, 312 [85 Cal.Rptr. 117].) The key question is whether the penalty is mandatory or discretionary, not whether the provisions awarding damages and imposing civil penalties are found in separate subdivisions of the statute.

Our conclusion is consistent with the analysis of *Krieger* v. *Nick Alexander Imports, Inc., supra,* 234 Cal.App.3d 205. In that case, the court considered both the procedural and substantive statutory scheme of the Act to determine whether to apply the four-year limitations period of California Uniform Commercial Code section 2725 or the three-year limitations period for statutory actions under Code of Civil Procedure section 338. (234 Cal.App.3d at pp. 213-214.) It noted "[t]he Act includes an explicit provision expressing the legislative intent that it supplement the provisions of the California Uniform Commercial Code: . . ." (*Id.* at p. 214, citing § 1790.3.[10]) The court also applied accepted rules of statutory construction to conclude the specific limitations period for express warranties was an exception to the general provision applicable to all actions on a statute. (*Ibid.*)

---

[10]Section 1790.3 reads: "The provisions of this chapter shall not affect the rights and obligations of parties determined by reference to the Commercial Code except that, where the provisions of the Commercial Code conflict with the rights guaranteed to buyers of consumer goods under the provisions of this chapter, the provisions of this chapter shall prevail."

Moreover, the damages and civil penalty provisions of the Act are found in the same code section. There is no indication the Legislature intended that subdivisions (a) and (c) of section 1794 be governed by different limitations periods. Such a construction might render the civil penalty ineffective as a deterrent to deliberate violations (*Kwan* v. *Mercedes-Benz of North America, supra*, 23 Cal.App.4th at p. 184), where the manufacturer's efforts at repair extended beyond the one-year limitations period.

### G.   *There Is Substantial Evidence to Support the Verdict.*

■■■    BMW argues there is insufficient evidence BMW violated the Act because: (1) BMW's repairs were adequate, and (2) the brake problem was caused by Jensen's driving style, not a defect in the vehicle. It also asserts there is insufficient evidence to support the jury finding BMW's violation was willful. We consider each challenge in turn after reviewing the familiar principles which govern our limited review of the jury's factual determinations.

■■■    "[A]ll conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. . . . [T]he power of the appellate court begins and ends with a determination . . . whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

"Substantial evidence" is " 'such relevant evidence as a reasonable [person] might accept as adequate to support a conclusion.' " (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Ibid.*) However, the testimony of a single witness, even the party herself, may be sufficient. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

■■■    The Act requires a manufacturer who gives an express warranty on a new motor vehicle to service or repair that vehicle to conform to the express warranty. If the manufacturer is unable to do so after a reasonable number of attempts, the buyer may seek replacement or restitution. (§ 1793.2, subd. (d)(2).) The court instructed the jury Jensen had the burden

of establishing "[t]hat the manufacturer directly or through their [*sic*] authorized dealers failed to conform the vehicle to the express warranty after a reasonable number of attempts." We conclude substantial evidence supports the jury's implied finding BMW's repairs were inadequate.

Jensen testified the brake shimmy recurred after each attempted repair. Roseville BMW's service manager stated he test-drove Jensen's car after the last completed repair and it did not exhibit a brake shimmy. However, he acknowledged the problem could have redeveloped between visits to his shop. He testified he was unable to solve the brake shimmy problem for Jensen.

BMW issued a technical bulletin in October 1990 which alerted dealerships about a brake shimmy in the 528e model. A Roseville BMW service writer and Hanggi test-drove the car and confirmed the shimmy. In addition, BMW's technical specialist drove the 528e in late 1991 when Roseville BMW was attempting repairs and again after the litigation commenced. He experienced a slight intermittent vibration on both occasions. Jensen's expert tested the car in August 1992 and described the vibration as "rather severe."

BMW's evidence that repair efforts eliminated the brake shimmy for a period of time does not lead necessarily to a conclusion the shimmy was fixed each time and recurred because of Jensen's driving habits. On this record, the jury could reasonably infer Roseville BMW's replacement of the rotors, pads, and other brake parts provided temporary relief from the shimmy but never resolved a fundamental defect in the braking system. We may not second-guess the jury's inference.

The Act is inapplicable to "any defect or nonconformity in consumer goods caused by the unauthorized or unreasonable use of the goods following sale." (§ 1794.3.) The court instructed the jury Jensen could not recover damages for breach of warranty if it found that "whatever injury or damage the plaintiff suffered in this case resulted solely from [Jensen's] improper use of the goods involved, . . ." BMW argues Jensen failed to rebut evidence her abusive driving style caused the brake problem. We conclude there is substantial evidence to support the jury's rejection of BMW's defense.

Direct evidence of Jensen's driving habits came from two sources— Jensen and her expert witness, Tom Stark. Both testified Jensen did not ride her brakes. Jensen explained that her father taught her to drive high-performance cars and emphasized the danger of riding the brakes. Stark testified his examination of the brake rotors showed no hot spots to indicate overheating.

Perhaps more significant is the fact that prior to this litigation, no one at BMW or Roseville BMW's service department ever told Jensen the brake shimmy was the result of her driving style and failure to maintain the car. Nor does Roseville BMW's service file include any language to suggest BMW believed Jensen responsible for the brake problem. On this record, a reasonable jury could find Jensen was not an abusive driver and no one at BMW or Roseville BMW's repair department seriously entertained that idea at the time.

Under section 1794, subdivision (c), the court may impose a civil penalty up to two times the amount of actual damages if the buyer proves the manufacturer's failure to comply was willful. The penalty is important "as a deterrent to deliberate violations. Without such a provision, a seller or manufacturer who knew the consumer was entitled to a refund or replacement might nevertheless be tempted to refuse compliance in the hope the consumer would not persist, secure in the knowledge its liability was limited to refund or replacement." (*Kwan* v. *Mercedes-Benz of North America, Inc.*, *supra*, 23 Cal.App.4th at p. 184.)

A violation is "not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present." (*Kwan* v. *Mercedes-Benz of North America, Inc.*, *supra*, 23 Cal.App.4th at p. 185.) Among the factors to be considered by the jury are whether: (1) the manufacturer knew the vehicle had not been repaired within a reasonable period or after a reasonable number of attempts, and (2) whether the manufacturer had a written policy on the requirement to repair or replace. (*Id.* at pp. 185-186.) BMW maintains Jensen failed to sustain her burden of proving willfulness. We conclude there is sufficient evidence to support the jury's express finding BMW willfully violated the Act.

We have already cited evidence to show BMW knew Jensen's car had not been repaired after six attempts over a period of nearly three years.[11] In December 1991, Jensen presented BMW with the option of replacing the car, with credit for the original down payment and lease payments, or refunding the down payment, lease payments, and fees. BMW refused to discuss the refund option. BMW acknowledged it did not have a written policy on replacement or repurchase of vehicles under the Act.

Instead, BMW proposed a trade assistance plan under which Jensen would lease a new 325i at a cost of several thousand dollars more than the value of the car. As the trial court aptly observed when denying BMW's motion for

---

[11]See pages 134-135, *ante.*

new trial, "I think that those are the kind of things that the jury could react to. And once finding the car defective they, in fact—they, BMW, did not respond in a straightforward manner to really assist in a trade, but attempted to talk her into a financial scheme that was, in fact, extremely onerous."

Contrary to BMW's argument on appeal, there is no evidence its reluctance to consider replacement or refund was based on the belief "this was a used vehicle which did not fall under Song-Beverly's new car provisions." As we noted, each repair order was stamped with the word, "WARRANTY." If the car was covered by BMW's express warranty for purposes of repair, a jury could infer it was covered by the express warranty for purposes of refund or replacement.

### III

*Jensen's Appeal*

The sole issue in Jensen's appeal is whether she is entitled to expert witness fees under section 1794, subdivision (d), which reads in part: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and *expenses*, including attorney's fees . . . ." (Italics added.)

Following trial, Jensen submitted a cost bill which included expert witness fees in the amount of $2,527. The court denied expert witness fees on the ground Code of Civil Procedure section 1033.5 does not provide for an award of such fees.[12] We independently review the trial court's interpretation of section 1794, subdivision (d) (9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 241 and 242, pp. 246-247), and conclude the court erred in denying Jensen's expert witness fees.

Code of Civil Procedure section 1033.5 defines items allowable as "costs." The statute expressly excludes "[f]ees of experts not ordered by the court" "*except when expressly authorized by law*." (Code Civ. Proc., § 1033.5, subd. (b)(1), italics added.)

Section 1794, subdivision (d), permits the prevailing buyer to recover both "costs" *and* "expenses." Examining the language of the statute (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.*, *supra*, 6 Cal.App.4th at p. 1238), it is clear the Legislature intended the word "expenses" to cover items not included in the detailed statutory definition of "costs." However, because the scope of the term "expenses" is uncertain, we turn to legislative history for clues about the Legislature's intent. (*Ibid.*)

---

[12]We grant Jensen's request that we take judicial notice of the court's order awarding fees, costs, and prejudgment interest filed on May 23, 1994. (Evid. Code, § 452, subd. (d).)

The Legislature added the "costs and expenses" language to section 1794 in 1978. (Stats. 1978, ch. 991, § 10, p. 3065.) An analysis by the Assembly Committee on Labor, Employment, and Consumer Affairs states: "Indigent consumers are often discouraged from seeking legal redress due to court costs. The addition of awards of 'costs and expenses' by the court to the consumer to cover such out-of-pocket expenses as filing fees, expert witness fees, marshall's fees, etc., should open the litigation process to everyone." (Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assem. Bill No. 3374 (May 24, 1978) p. 2.)

In *Ripley* v. *Pappadopoulos* (1994) 23 Cal.App.4th 1616 [28 Cal.Rptr.2d 878], we stated that the "Legislature has reserved to itself the power to determine selectively the types of actions and circumstances in which expert witness fees should be recoverable as costs and such fees may not otherwise be recovered in a cost award." (*Id.* at p. 1625.) In this case, the Legislature amended section 1794 to provide for the recovery of "costs *and* expenses." The legislative history indicates the Legislature exercised its power to permit the recovery of expert witness fees by prevailing buyers under the Act and within the meaning of *Ripley*.

The trial court denied Jensen's request for expert witness fees based on the legal determination those fees were barred by Code of Civil Procedure section 1033.5. For this reason, we remand the case to permit the court to determine whether the amount of fees sought by Jensen were "reasonably incurred by the buyer in connection with the commencement and prosecution of [this] action." (§ 1794, subd. (d).)

### DISPOSITION

The portion of the judgment denying Jensen's request for expert witness fees is reversed and remanded with directions to determine whether those fees were reasonably incurred. The judgment is affirmed in all other respects. Jensen shall recover costs and attorney fees on appeal.

Sims, Acting P. J., and Scotland, J., concurred.

A petition for a rehearing was denied June 22, 1995, and the opinion was modified to read as printed above. The petition of appellant BMW of North America, Inc., for review by the Supreme Court was denied September 21, 1995.