Filed 11/18/15  K.C. v. T.O. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| K.C.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>T.O.,<br><br>    Defendant and Respondent. | B255825<br><br>(Los Angeles County<br>Super. Ct. No. BF028912) |

APPEAL from an order of the Superior Court of Los Angeles County.  Tamara E. Hall, Judge.  Affirmed.

K.C., in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

_____

K.C. (Father) appeals from the trial court's order denying his request for sole legal and physical custody of his two children, N.C., age 12 (Older Daughter), and M.C., age 10 (Younger Daughter) (collectively Daughters). Father contends the court (1) denied him his constitutional right to a trial, (2) deprived him of due process, (3) abused its discretion when it refused to admit certain evidence and testimony, and (4) without this evidence there was insufficient evidence to support the court's custody order. We disagree and affirm.

## BACKGROUND

Father and T.O. (Mother) (collectively Parents) were in a relationship for approximately three years between 2001 and 2005. Mother entered the relationship with a child from a previous relationship. The child passed away from a cardiac condition within the first few months of Parents' relationship. Parents subsequently welcomed Daughters. After Parents ended their relationship, Mother and Daughters moved in with Mother's sister. During this time, Father had some, but sporadic, interaction with Daughters. In 2006, Father filed for the court to establish a parental relationship and to issue custody and visitation orders. Father was shortly thereafter incarcerated, mooting his request. Father had little to no contact with Daughters while incarcerated. He was released in 2009, and refiled for the court to establish a parental relationship and issue custody and visitation orders. Before Father's hearing occurred, however, Mother obtained a three-year restraining order for herself and Daughters against Father. The court consequently denied Father's mooted requests. When Mother's restraining order expired in 2012, the court denied her request to extend it. Due to Parents' inability to subsequently agree on a custody arrangement, the court ordered the parties to attend mediation in 2013. After mediation, the court held a hearing. The court granted Father four visitation hours per week. Parents were to exchange Daughters at a police station. The court ordered Parents to participate in a parenting plan assessment program (PPA).

Parents and Daughters met with a court-appointed evaluator (Evaluator) for a PPA on August 14, 2013. After the PPA, the court held a hearing where Evaluator spoke to

the court at length. Parents, who were both in propria persona, were given the opportunity to question Evaluator, but each declined. Parents then spoke to the court. Each leveled accusations against the other. Father requested to submit a document from the Hawthorne police station and some photographs. The court denied the request. At the conclusion of Parents' statements, the court awarded Mother sole legal and primary physical custody of Daughters and continued Father's weekly four-hour visits. The court ordered Parents to enroll in Our Family Wizard, a software program designed to manage co-parenting. The court also ordered Father to attend parent education classes and anger management. Father appealed.

## DISCUSSION

Father argues he was effectively denied a trial because his right to due process was violated when the court denied him the opportunity to meaningfully testify and did not receive into evidence certain documents and photographs. Similarly, he argues the court's described decisions were an abuse of discretion. These arguments are based on the same complaint, and we therefore address them together. He further contends these procedural errors prevented the court from having sufficient evidence to render its order awarding custody to Mother. We disagree and affirm.

We review the court's admissibility determinations for an abuse of discretion. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) We review the sufficiency of the evidence under a substantial evidence test. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.) Substantial evidence is "'"relevant evidence"'" that is "'"reasonable in nature, credible, and of solid value"'" such that "'"a reasonable [person] might accept [it] as adequate to support a conclusion."'" (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 134.) Under the substantial evidence test, the court gives the prevailing party the benefit of every reasonable inference and resolves all conflicts in its favor. (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.) If substantial evidence supports the judgment, the court must sustain the judgment even though the court may have reached a different conclusion based on other substantial evidence. (*Bowers*, at pp. 873–874.)

3

**A.    The court did not deny Father due process or abuse its discretion in its conduct admitting testimonial evidence.**

Father alleges the court abused its discretion when it prevented him from testifying. The record contradicts this contention. When Father tried to make a statement when Evaluator was speaking at the beginning of the hearing, the court instructed him to wait "[o]ne moment. You'll have an opportunity to speak." At the conclusion of Evaluator's statements, the court asked Father if he would like to address the court. Father accepted and spoke for several minutes. During this time, the court asked a few questions, which Father addressed. The record does not reflect Father requested or attempted to make additional statements or that the court otherwise prevented him from speaking at this stage. Mother then spoke. When Mother was speaking, the court asked Father, regarding a particular contention of Mother's, whether Mother was "making [it] up? Yes or no?" to which Father replied, "Yes, can I address that?" The court responded, "No." At the end of Mother's comments, Father asked the court if he could address the court again, and the court obliged. Father spoke primarily about Mother's perceived shortcomings, but the court interjected that, in light of what it had already heard, it did not want to hear additional ad hominem attacks on Mother. Father resumed speaking, but again focused on Mother. The court again stopped Father, but before ruling asked, "Anything further?" Father did not make any further statements.

Father was not denied due process by the court's conduct. He had three distinct opportunities to address the court, including one right before the court ruled. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 [court should not rule without having "'"heard all competent, material, and relevant evidence the parties desire to introduce"'"].) Father took two of those opportunities. He does not allege, nor could he, that the court had any particular obligation beyond giving him the opportunity to testify to satisfy due process. (*Burt v. County of Orange* (2004) 120 Cal.App.4th 273, 286 [requiring *reasonable opportunity* to be heard].) Rather, Father alleges additional testimony was necessary for "clarification" of the record. Whether that is true, Father had the opportunity to clarify the record, but failed *himself* to do so. (*Ducray v. Ducray*

4

(1967) 257 Cal.App.2d 480, 484 [afforded "at least" an opportunity to testify, plaintiff was "not prevented from having her day in court" because she could have provided "missing" testimonial evidence *herself*].) "Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him . . . an *opportunity* to be heard." (*In re B. G.* (1974) 11 Cal.3d 679, 688–689, italics added.) Given that Father testified more than once and also was afforded the chance to say any final words before the court rendered its order, the court did not abuse its discretion and satisfied due process.

Father additionally alleged "[i]nconsistent and unreliable testimony of witnesses also contributed to the trial court[']s] erroneous judgment." Father, however, failed to explicate what testimony was inconsistent or unreliable. Absent identification of what testimony was objectionable and why, we cannot and do not consider this contention. (*Ward v. Litowsky* (1970) 5 Cal.App.3d 437, 439 [contention not supported by authority or argument requires no discussion].)

**B.     The court did not abuse its discretion in denying admission of Father's documentary and photographic evidence.**

Father also claims the court abused its discretion in not allowing him to submit documentary and photographic evidence. As to the documentary evidence, Father points to only one specific example. At the end of the hearing, the court refused to receive a document Father claims contained a statement from a police officer saying Daughters told the officer that Mother had instructed them not to leave the police station to visit with Father. Mother, however, never denied instructing Daughters not to leave the police station with Father. Even if she had, it was harmless error to not admit the document in light of the substantial evidence presented and in the record, as described below. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 [agreeing that procedural error is "harmless error where the record contain[s] substantial evidence to support" court's findings]; *In re Nikolas T.* (2013) 217 Cal.App.4th 1492.)

5

Father further contends he was prevented from introducing evidence "as to violence perpetrated" by Mother against him.  Similarly, he stated evidence "from the case file" would have shown he was never violent toward Mother and Daughters.  The evidence Father parenthetically cites to, however, is from the clerk's transcript.  It is elementary that evidence already in the record need not be submitted into the record again.

As for the photographic evidence, Father argues pictures of Daughters would have shown they were not well cared for because they were dressed in dirty clothes.  Mother admitted, however, that Daughters would sometimes return home from school dirty from playing.  Father's photographic evidence of this fact was cumulative and therefore unnecessary.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 415 [admission of "photographic evidence" reviewed on grounds of "undue prejudice or cumulativeness for abuse of discretion"].)  The court did not abuse its discretion in not accepting the photographs.

## C. Substantial evidence supported the court's custody order.

Father argues that without this additional testimonial and tangible evidence, the court did not have substantial evidence to grant Mother custody.  Evaluator's, Parents', and Daughters' statements and the record refute this contention, however.  As to Evaluator's comments, Evaluator extensively spoke to the court about her findings and recommendations from the PPA.  To establish a foundation for her testimony, the Evaluator stated she had prepared for the PPA by reviewing "the legal file," Parents' declarations, records from the Los Angeles County Department of Children and Family Services (DCFS), Daughters' report cards, California Information and Identification number information, and department of motor vehicles records.  She had also spoken with the father of Daughters' half brother and Daughters' principal.

Evaluator described her assessment as follows.  "According to both parties," since Parents separated, Daughters "have lived primarily with Mother."  From that time, Daughters' visitation with Father "has been sporadic and varied."  After years of such inconsistent custody, the court ordered four-hour weekly visits for Father in 2013.  The order instructed Parents to meet and exchange Daughters at the Hawthorne police station,

but for the first few months Daughters refused to leave the police station with Father. Father contends this was because Mother instructed them not to. Eventually, Daughters relented and agreed to leave with Father. Since then, Daughters have been consistently visiting with Father for the past few months.

Evaluator allowed Parents to each address their concerns during the PPA. Mother claims Father has a "vendetta" against her. She claims he acts in ways that in her opinion are not congruent with "him wanting to have a relationship with" Daughters. "It's more about trying to somehow hurt her." In this regard, Mother says Father "has a long history" of being "harassing, menacing" and "scary." Evaluator agreed Father's behavior was "definitely . . . unpredictable and definitely a little unstable." Among Mother's examples of Father's threatening behavior: he followed her home; climbed on her roof and slept there; slept in a car in front of her house; glued shut her front door; poured sugar in her gas tank; slit her tires; harassed her at all of her residences; threatened her and her boyfriend; falsely instigated DCFS investigations, including sexual abuse allegations which required Daughters to have a "checkup"; repeatedly sent the police to her home for unnecessary child welfare checks; and threatened to kidnap and never return Daughters. The record also contains harassment and assault allegations Mother made against Father in restraining order requests: Father dragged Mother into the street, ripping her clothes and breaking her jewelry; tried running her off the road while Daughters were in the car; blocked the entrance to Daughters' school, preventing Mother from bringing them inside; broke her window and attempted to enter her home to see Daughters; and accosted her in a parking lot and grabbed Older Daughter, leaving marks on Older Daughter.

Mother says this "scary" behavior extends to Daughters, occasionally, as well: Father put Daughters in a corner when they refused to leave the police station with him; yelled at one daughter for spilling soap; and told Daughters he would "whip the F out of them" if they came home dirty. He also allegedly told Daughters several times their younger half brother will "die soon," which is "painful" and "scary" for Daughters given Mother has told them about her child who passed away as an infant when she lived with

Father.  Mother believes this behavior is "impacting [Daughters'] emotional development."  For example, Mother reported that one daughter was, but is no longer, throwing up before visits with Father.  Evaluator reported that during the PPA Daughters were "stuck on their mom like glue" and, in contrast, did not "show any affection toward their father."

Mother also reported Father's behavior had affected others in their lives.  Mother claims visitation exchanges had to be at the police station because everybody "in their lives" "has been affected by . . . Father in some kind of a way," causing them to refuse facilitating exchanges.  Evaluator also said Father had subpoenaed copies of Daughters' emergency contact cards from their school because, according to him, he thought Mother had allowed strangers to give Daughters rides; Father later admitted, however, that the "strangers" were unfamiliar to *him* because he did not know them from "the early days" of Parents' relationship.  Father admits to being "a very persistent person," but denies being "scary or abusive."

Mother had additional complaints.  She claims Father "speaks negatively" about her to Daughters, including calling her "fat" and "ugly."  Daughters report Father also criticizes other family members to them.  Mother also accused Father of speaking to Daughters about inappropriate adult matters, such as legal concerns and their weight.

Father, on the other hand, claims Mother neglects Daughters.  He says they are not "well cared for," "not well dressed," and "dirty."  Mother says Daughters are dirty only from playing at school.  Father also alleges Mother has undermined him to Daughters and is not supportive of them having a relationship with him; essentially, he does not have "trust and faith in her as a mother" and he "really just sees her as trying to take the kids away from him."  More specifically, Father alleged Mother "abducted" and "conceal[ed]" Daughters from him.  Father admitted, however, there have been times when "he would see them every day."  Also conflicting with Father's statements, Mother is supportive of the current custody arrangement and agrees it would be beneficial to Daughters to allow them to continue to develop a relationship with Father.  In the past, she has reportedly

8

encouraged Daughters to have a relationship with Father because she believes a paternal relationship is important.

Father also contends Mother has allowed male companions to be violent in Daughters' presence and allows Daughters to be exposed to "gang and drug activities" to the extent that a "rival gang shot up the children's room." Father failed to offer a scintilla of evidence to support these accusations, however, including an oral explanation or police reports. Yet the record contains evidence of Mother's questionable behavior. For example, after a domestic dispute involving Mother, her boyfriend, and Father, Mother yelled "faggot" at Father in front of a police officer and told the officer the situation "would have been different if she had a knife." Father claims Mother later told him she would burn his family member's house down in retaliation for Father's part in the dispute, which led to Mother's arrest for terrorist threats. Despite the serious nature of these allegations, we disregard Father's statements under the substantial evidence test. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589 [courts are to disregard conflicting evidence and consider only evidence favorable to verdict].)

In addition to Parents' thoughts, Evaluator also spoke with Daughters and assessed their well-being. Evaluator found Daughters to be "credible" and confirmed that they seemed scared of and apprehensive about Father. Although Daughters' principal reported Daughters generally have been doing well, Older Daughter's grades have been dropping. Around the time her grades began dropping, she started spending more time with Father and less time with Mother's boyfriend, who had helped her with homework but no longer was able to because he was forced to move out of Mother's home due to Father's restraining order. Evaluator also gave Daughters the opportunity to air some of their concerns about Father in his presence. According to Evaluator, Father "spent a lot of time defending his position, denying what the girls were saying, trying to make it seem as though [the problems] w[ere] [M]other's doing." Evaluator concluded that Daughters "do not have a lot of trust in" or "secure attachment with" Father.

The record also contained what appeared to be handwritten letters from Daughters to the court. The letters contained numerous concerning statements: Father "put

gre[a]s[e] on the po[r]ch and I sl[i]p[p]ed and bumped my head"; "he also cho[ked] my sister"; "Please, please don't let us go with [ou]r dad because he said that if my sister and I come home with him we are going to get a hard wupen [*sic*] if we come home d[irty]"; he "sne[a]k[ed] up on us and I was scared"; he "always make[s] me cry"; "pleas[e] tell him to le[ave] [ou]r family alone." Another letter stated: "Please, please, please don't let us go with [our] dad. I am very very s[cared] of him becaus[e] he said he is going to hurt us with the belt if we are d[irty]"; Father intentionally "backed up and hit [our] car and [caused] my sister [to] hurt[] her arm"; "he has d[one] a lot of thing[s] that I don't like" such as "standing at the window" and "thre[aten]ing us"; and "he also wished death on my little brother." Yet another letter said: "we cannot go outside and play" because "[w]e have to w[atch] out to see if he is following us somewhere" and Father "do[es] not deserve me and my sister[']s love."

At the end of the PPA, Evaluator's impression was that Father is "more concerned about trying to prove a point than he is about trying to connect with his kids" and "has a lot to learn" "about how to be with these girls." Evaluator stressed that Parents' acrimonious interactions needed to be improved, as did their communications about each other to Daughters. Evaluator noted, in Mother's defense, however, that Mother has a peaceful co-parenting relationship with her son's father, who described Mother as "an excellent mother" and did not report any parenting concerns.

Based on Evaluator's, Parents', and Daughters' statements and the record, and notwithstanding Father's unsubstantiated accusations, there was substantial evidence for the court to conclude the custody arrangements should remain the same.

Trial courts have """"the widest discretion"""" in fashioning custody arrangements that are """"in the best interest of the child"""" and operate under the assumption that existing custody arrangements should not be disturbed unless the parties demonstrate "'some significant change in circumstances.'" (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1087–1088; Fam. Code, § 3040, subd. (c); *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 30–38.) Substantial evidence supports the trial court's affirmation of the existing custody arrangements and Father presented no evidence the court abused

10

its discretion in upholding the original custody order.  (*LaMusga*, at pp. 1087–1088 ["'deferential abuse of discretion test'" applies in reviewing custody orders].)

## DISPOSITION

The custody order is affirmed.  T.O. is awarded her costs on appeal, if any, under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


                                                    LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.