[No. H023589. Sixth Dist. June 11, 2003.]

JAMES ATKINSON, Plaintiff and Appellant, v.
ELK CORPORATION, Defendant and Respondent.

**COUNSEL**

Sharon L. Kinsey; Mazur & Mazur, Janice R. Mazur and William E. Mazur for Plaintiff and Appellant.

Burton, Volkmann & Schmal and John S. Burton for Defendant and Respondent.

**OPINION**

**ELIA, J.**—James Atkinson (hereinafter Atkinson) appeals from a judgment of nonsuit entered in favor of Elk Corporation (hereinafter Elk). For the reasons outlined below we will reverse.

*Procedural History*

Atkinson filed a complaint on December 22, 1999, against Elk and Lyle Thomas doing business as Pacific Coast Roofing (hereinafter Pacific). The

first cause of action alleged breach of express warranty under the Song-Beverly Consumer Warranty Act (hereinafter Song-Beverly) (Civ. Code, § 1790 et seq.) against Elk. The second cause of action alleged breach of implied warranty under Song-Beverly against Elk. The third cause of action alleged violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) against Elk and Pacific.[1]

On April 25, 2001, Atkinson filed a motion to amend the complaint to add two causes of action under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act (15 U.S.C. § 2301 et seq.) (hereinafter Magnuson-Moss); a cause of action for fraud; and a cause of action for violations of the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.) At the same time, he moved to continue the trial.

Shortly thereafter, Elk filed a combined opposition to Atkinson's motion to amend and to continue the trial. On May 4, 2001, the court denied both of Atkinson's motions.

Between May 4 and May 9, 2001 both parties filed trial briefs and several motions in limine. Relevant here, Elk's trial brief No. 1 was entitled, "Plaintiff's shingles are not 'consumer goods' and, therefore, the provisions of the Song-Beverly Consumer Warranty Act are not applicable in this action." Additionally, Elk filed trial brief No. 3, which raised the issue of the timeliness of Atkinson's second cause of action for breach of the implied warranty of merchantability (Civ. Code, § 1791.1, subd. (c).) Both parties filed opposition to some of the opposing party's motions in limine.

On May 9, 2001, the trial court heard and ruled on the various pending motions.

After considering the argument of counsel, conducting research and, pursuant to the facts as stipulated by both Atkinson and Elk,[2] on its own motion, the trial court ruled that Atkinson was not a buyer of consumer goods within the meaning of Song-Beverly. As such, he did not have standing to assert his two remaining causes of action,[3] thereby entitling Elk to nonsuit.

---

[1]Subsequently, Pacific was dismissed from the action on February 2, 2000 and is not a party to this appeal.

[2]The court asked the parties to enter into a stipulation that Atkinson "entered into an agreement with Pacific Coast Roofing on August the 15th of 1992, and that a true and correct copy" of that contract was attached as exhibit A to Elk's various motions.

[3]The two remaining causes of action were for breach of express warranty under Song-Beverly and breach of implied warranty under Song-Beverly. The cause of action under the

In addition, the trial court took under submission the issue of whether the second cause of action for breach of the implied warranty of merchantability was barred by the provisions of Civil Code section 1791.1, subdivision (c).[4]

On May 11, 2001, the trial court found in favor of Elk and issued a ruling that the second cause of action was time-barred.

The trial court entered judgment of nonsuit on August 2, 2001.

Atkinson filed a timely notice of appeal.

Atkinson raises four issues on appeal. First, he contends that the trial court erred as a matter of law when it granted nonsuit to the defendant. Second, the trial court erred in concluding that the second cause of action for breach of the implied warranty of merchantability was time-barred. Third, the trial court erred in denying his motion to amend the complaint and continue the trial. Lastly, the trial court erred in granting Elk's in limine motions numbers four and five to exclude evidence related to Elk's knowledge of problems with the shingles.

We will set forth the facts of this case to the extent necessary for a resolution of the issues.

### Facts[5]

As Atkinson concedes, the facts of this case are virtually undisputed. Furthermore, as Elk points out, they were "the subject of a stipulation before the [trial] court on May 9, 2001."

On August 15, 1992, Atkinson contracted with Pacific to reroof his family home. Atkinson chose Prestique I shingles manufactured by Elk as the roofing material. The brochure in which the shingles were advertised

---

Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) had been dismissed on a motion for summary adjudication on March 28, 2001.

[4]Civil Code section 1791.1, subdivision (c) states in pertinent part: "The duration of the implied warranty of merchantability and where present the implied warranty of fitness shall be coextensive in duration with an express warranty which accompanies the consumer goods, provided the duration of the express warranty is reasonable; but in no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer. Where no duration for an express warranty is stated with respect to consumer goods, or parts thereof, the duration of the implied warranty shall be the maximum period prescribed above."

[5]Since this case was dismissed prior to trial on the court's own motion, the facts are primarily taken from the parties' trial briefs and in limine motions.

contained the following language: "When you upgrade to Prestique I *High Definition*, you get the protection and durability to match the beauty. Elk's 30-year limited warranty covers both labor and shingles, plus you get a 5-year limited wind warranty." The last page of the brochure contained a comparison chart of Elk products, including the applicable limited warranties. The warranty for the Prestique I shingles stated that it was "30 years: Material/Labor: 5 years: Wind." The brochure, however, did not contain any disclaimers or other limitations and Atkinson did not see or receive any other warranty. When Atkinson went to the building supply facility where the shingles were purchased, there was no other limited warranty on display, nor was he given one.[6]

Based on the written warranty he saw in the brochure, Atkinson instructed Pacific to use Elk Prestique I shingles to reroof his home. Atkinson paid Pacific $7,400 for the reroofing work. Included in that price was the cost of the shingles.[7]

In January 1998, while cleaning the gutters in his roof, Atkinson noticed cracks in many of shingles. Immediately, he contacted Pacific. Pacific contacted Elk.

In February 1998, Elk telephoned Atkinson requesting a copy of the contract between Atkinson and Pacific. Atkinson faxed the contract that same day.

In March 1998, Brian Woods from Elk called Atkinson to set up an appointment to visit Atkinson's home in order to take a sample of the damaged shingles to be tested and evaluated by Elk. The analysis conducted by Elk revealed that the shingles were defective and had to be replaced.

In April 1998, Atkinson received a letter and check from Elk for $2,949.79. Atkinson called Elk and spoke to Kim Gutierrez. He asked Ms. Gutierrez to explain how Elk arrived at that number.

In May 1998, Atkinson received a letter from Ms. Gutierrez explaining that the $2,949.79 was a prorated amount for materials and labor for the shingles applied to his roof in 1992.

---

[6] It appears that Elk provides another limited written warranty, with prorated settlement in the case of a manufacturing defect. The written warranty is limited to replacement materials and actual replacement, but does not apply to any tear off of the failed material.

[7] The contract did not break out the costs of materials or the costs for labor.

Atkinson did not respond to Ms. Gutierrez's letter until November 18, 1998.[8] He wrote to Ms. Gutierrez to dispute the settlement amount and return the check. He explained that the settlement amount did not cover the actual cost of material and labor in his geographic area.

Ms. Gutierrez responded on December 3, 1998. Included in her letter was the original check that Atkinson had returned and a copy of a lengthy one-page document entitled "Limited Warranty." Atkinson had never seen this "Limited Warranty" before.

Between December 1998 and April 1999, Atkinson sought the aid of a consumer legal advocate from a local television station to help his efforts to resolve this matter with Elk.

On April 1, 1999, Atkinson left a message for Linda Frazier, an Elk field service representative. On April 2, 1999, Bonnie Dlabaj, an Elk technical administrative assistant, telephoned Atkinson and informed him that Ms. Frazier was out and that the case was closed. Atkinson asked that Ms. Frazier call him the following Monday.

On April 5, 1999, Ms. Frazier called to say she would reevaluate the settlement. She asked Atkinson to obtain three bids to reroof his home. She asked that the bids be broken down to include the individual costs for tear off, materials and labor. Also, she requested that the roofers not be allowed to see the roof before they bid. Atkinson obtained three bids as requested.

On July 21, 1999, Atkinson sent a letter to Ms. Frazier with the three bids, which ranged from a low bid of $6,480 to a high bid of $7,350.

On August 16, 1999, Atkinson received a letter from Ms. Frazier offering the same refund as before, $2,949.79. Ms. Frazier stated that according to the terms of the Limited Warranty, Atkinson was not entitled to the cost associated with tear off of the defective shingles, flashings, nails, stucco work, or any other related costs of replacing the shingles.

This litigation ensued.

*Discussion*

*Nonsuit*

Atkinson argues that the trial court erred as a matter of law when it granted nonsuit to the defendant.

---

[8]It appears that Atkinson's wife was ill with cancer and Atkinson was preoccupied from May to November.

█ "A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury. [Citation.] Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded." (*Id.* at p. 118.) "A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].)

Initially, we note that in 1998, Code of Civil Procedure[9] section 581c was amended by the Legislature. Formerly, section 581c stated: "After the plaintiff has completed his opening statement, or the presentation of his evidence in a trial by jury, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit. . . ." (Stats. 1961, ch. 692, § 1, p. 1927.)

Currently, section 581c states: "Only after, and not before, the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury, the defendant, without waiving his or her right to offer evidence in the event the motion is not granted, may move for judgment of nonsuit. . . ."

In light of the change in the language of section 581c we asked for supplemental briefing on the issue of the propriety of granting a nonsuit before plaintiff had made an opening statement.

█ Atkinson asserts that the passage of Senate Bill No. 1556 (1997-1998 Reg. Sess.), which amended section 581c "changed the Code so that a motion for nonsuit may not be made before completion of the plaintiff's opening statement, and specified the intent of the Legislature in this regard." We agree.

---

[9]All further statutory references are to Code of Civil Procedure unless otherwise noted.

However, our review of the record reveals that nonsuit was granted on the court's own motion.[10] Here, the court listened to the argument of counsel, conducted independent research, and asked for a stipulation that Atkinson had entered into a contract with Pacific; and that a true and correct copy of that contract was attached as Exhibit A to various pleadings submitted to the court by respondent. When the parties entered into the stipulation the court ruled as follows: "I was very troubled by what was Trial Brief Number 1, as I said; and we discussed it earlier. And that is the issue of consumer goods and whether this case qualifies under Song-Beverly. And so, as a process, I went to [Civil Code section] 1791 and read that a few times. I went to Magnuson-Moss and read that a couple of times. I looked at the contract that has just been stipulated as being the correct contract between the plaintiff and the roofing company, Pacific Coast Roofing. [¶] And the court finds as follows: That under these circumstances, Mr. James Atkinson does not qualify as a buyer or retail buyer under 1791(b). 1791(b) provides that a buyer or retail buyer means any individual who buys consumer goods from a person engaged in the business of manufacturing or distributing or selling consumer good[s] at retail. . . . The Court finds that Mr. Atkinson didn't buy consumer goods; that Pacific Coast Roofing bought consumer goods based on the contract and the offers of proof that have been made thusfar this morning."

██ We find that the grant of nonsuit in favor of respondent on the court's own motion was irregular.[11] ██ "In the absence of express statutory authority, a trial court may, under certain circumstances, invoke its limited, inherent discretionary power to dismiss claims with prejudice.

[10]By way of supplemental briefing, respondent argues, "[i]t is clear from the record on appeal that both parties stipulated that the Trial Court rule *in limine* on Respondent's motion for nonsuit based on facts set forth in Respondent's Trial Brief No.1, and addendum to Trial Brief No. 3, prior to impaneling of the jury, opening statements, or Atkinson's presentation of the evidence. The Judgment on Nonsuit, which bears the signature of Atkinson's counsel, . . . , states in relevant part as follows: 'Rather than to require the impaneling of a jury, opening statements and plaintiff's evidence, the parties stipulated that the Court rule *in limine* on defendant's motion for non-suit based upon the matters contained in defendant's Trial Brief No. 1 and Addendum to Trial Brief No. 3. . . .' " We can find nothing in the record to indicate that before the court granted nonsuit Atkinson had stipulated to anything other than that he entered into a contract with Pacific to reroof his house.

[11]We note that the author of Senate Bill No. 1556 asserted that amendment to section 581c was needed because "[c]ase law does not presently forbid a motion for non-suit prior to the opening statement. A motion for non-suit after an opening statement is logical because a plaintiff in an opening statement must state that the evidence will prove every element of the particular case at bar. If the plaintiff doesn't promise the jury evidence of every element of the case, then it's logical and sensible for the defendant to make the motion, and for the court to grant it. A motion for non-suit prior to the opening statement, however, is nonsensical and wasteful of court time for all concerned." (Sen. Quentin L. Kopp, sponsor of Sen. Bill No. 1556 (1997-1998 Reg. Sess.), letter to Governor, July 15, 1998.)

[Citations.]" (*Lyons v. Wickhorst* (1986) 42 Cal.3d 911, 915 [231 Cal.Rptr. 738, 727 P.2d 1019]; see also § 581, subd. (m) [The provisions of § 581 shall not be deemed to be an exclusive enumeration of the court's power to dismiss an action or dismiss a complaint as to a defendant].) However, the power of the court to dismiss actions with prejudice "has in the past been confined to two types of situations: (1) the plaintiff has failed to prosecute diligently (*Romero v. Snyder* (1914) 167 Cal. 216 [138 P. 1002].); or (2) the complaint has been shown to be 'fictitious or sham' such that the plaintiff has no valid cause of action (*Cunha v. Anglo California Nat. Bank* (1939) 34 Cal.App.2d 383, 388 [93 P.2d 572])." (*Lyons v. Wickhorst, supra,* 42 Cal.3d at p. 915, fn. omitted.)

 Neither of those situations is present here. However, we will not reverse for this irregular procedure unless we find that Atkinson was prejudiced. (*Ford v. Evans* (1938) 29 Cal.App.2d 623, 625 [85 P.2d 214]; Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

Accordingly, we turn to the issue of whether Atkinson would have survived a motion for nonsuit after an opening statement.

In order for Atkinson to prevail in an action under Song-Beverly, he must be a "buyer of consumer goods." (Civ. Code, § 1794, subd. (a).) Accordingly, we must make a two-part inquiry. First, is Atkinson a "buyer" of consumer goods? Second, are roof shingles consumer goods within the meaning of Song-Beverly?

Civil Code section 1791 provides definitions pertinent to Song Beverly. Subdivision (b) defines "buyer" or "retail buyer" as "any individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail." (Civ. Code, § 1791, subd. (b).)

Atkinson points out that there are no California cases interpreting this term or definition as used in Song-Beverly.

 Thus, we begin with the well-established principle that statutory construction is a question of law. (*National R.V., Inc. v. Foreman* (1995) 34

---

However, we can see no greater waste of court time than to require that a jury be impaneled and plaintiff make an opening statement, before the court could rule as a matter of law that Atkinson was not a retail buyer within the meaning of Song-Beverly.

Cal.App.4th 1072, 1077 [40 Cal.Rptr.2d 672].) "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.]" (*Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

However, if the statutory language "is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

As noted above, a "buyer" or "retail buyer" is an "individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail." (Civ. Code, § 1791, subd. (b).)

Black's Law Dictionary (7th ed. 1999) at page 1317 defines retail as "[t]he sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing." Furthermore, Merriam-Webster's Collegiate Dictionary (10th ed. 1999) at page 999 defines retail as "to sell in small quantities directly to the ultimate consumer."

Elk does not sell its products directly to the public. Elk sells its product to retail sellers, or contractors who then use the products, along with other products, to fulfill roofing or reroofing contracts. Thus, unless Pacific is a retail seller within the meaning of Song Beverly, Atkinson is not a buyer.

"Retail seller," "seller," or "retailer" means "any individual, partnership, corporation, association, or other legal relationship that engages in the business of selling or leasing consumer goods to retail buyers." (Civ. Code, § 1791, subd. (*l*).)

Atkinson argues that "application of the well-established rules of statutory construction lead to the inevitable conclusion that . . . [Pacific] is a 'seller' within the meaning of [Civil Code] section 1791."

Elk asserts, "Pacific, as a roofer, does not sell shingles as its 'product.' Instead, the product a roofing contractor 'sells' is a roofing system, of which the shingles, just like the sheet metal flashing, roof gutters, plywood sheathing and felt underlayment, are but one component."

In the context of Song-Beverly it is not clear if this distinction is dispositive. The Legislative history of Senate Bill No. 272 (1970 Reg. Sess.), the

bill that introduced Song-Beverly, indicates that Alfred H. Song, one of the sponsors of Song-Beverly, considered the distinction. In a letter to then Governor Ronald Reagan, Senator Song wrote as follows: "First, the bill deals only with the retail sale of 'consumer goods', a term which is rather narrowly defined. Non-retail sales of consumer goods, retail sales of non-consumer goods, and all non-retail commercial transactions will continue to be regulated by the Commercial Code and would not be affected by SB 272." (Sen. Song, sponsor of Sen. Bill No. 272 (1970 Reg. Sess.), letter to Governor, Aug. 24, 1970.)

Furthermore, in reply to a concern expressed by the executive secretary of California Council of Airconditioning and Refrigeration Contractors' Associations, Senator Song wrote the following: "While there may be some borderline cases, my bill applies to situations in which a consumer purchases a product from a retail seller. . . . This bill, unlike our SB1166 of last year, does not involve relationships between contractors, subcontractors, etc." (Sen. Song, sponsor of Sen. Bill No. 272 (1970 Reg. Sess.), letter to Henry B. Ely, California Council of Airconditioning and Refrigeration Contractors Associations.)

However, when Senate Bill No. 272 was finally chaptered no distinction was made between contractors and "retail sellers." (Stats. 1970, ch. 1333, § 1, pp. 2478-2479.) As we have no way of knowing why this happened, or what Senator Song meant when he wrote that Senate Bill No. 272 did not involve relationships between contractors, subcontrators, etc., we believe that the more sound result is to find that Pacific is a retail seller within the meaning of Song-Beverly.[12]

Accordingly, we turn to the issue of whether roof shingles are consumer goods within the meaning of Song-Beverly.

" 'Consumer goods' means any new product or part thereof that is used, bought, leased for use primarily for personal, family, or household purposes, except for clothing and consumables." (Civ. Code, § 1791, subd. (a).)

Elk concedes that "[t]he definition of 'consumer goods' found in Civil Code Section 1791[, subdivision] (a), is admittedly broad," but asserts that

---

[12]Assuming, without deciding at this point that roof shingles are consumer goods, we can envision two different scenarios. One, the situation we have in this case, the roofer buys the tiles from the manufacturer and installs the tiles as part of a reroofing contract. Two, the homeowner buys the roof shingles from a local home improvement store and then pays the roofer to install the shingles. Were we to hold that the roofer is not a retail seller we would have an absurd result. Under scenario one, the homeowner has no recourse against the manufacturer under Song-Beverly. Under scenario two, he does.

"the definition clearly encompasses new products bought primarily for household purposes."

Elk asserts "that the only reasonable interpretation of the definition" of the term "household purposes" "include[s] such things as home appliances, furniture[,] other things used by the individual in the home." Further, he asserts, "building materials obtained and used in the complete re-roofing of a home by a roofing contractor as an addition to the realty clearly were not contemplated to be included in the definition."

Elk urges this court to follow two cases from other states that have found that building materials are not consumer goods used for household purposes.

In *Potomac Plaza Terraces, Inc. v. QSC Products, Inc.* (D.C. Cir. 1994) 868 F.Supp. 346 (hereinafter *Potomac*), the plaintiff, a housing corporation, alleged among other things that the defendant had breached an implied warranty of merchantability. The action was based upon the failure of two roofing systems that used a polyurethane coating manufactured by QSC.[13] Plaintiff argued that defendant's product was a consumer good. The court disagreed. The court noted that consumer goods consist of products used or bought for use primarily for personal, family, or household purposes. District of Columbia courts had not specifically defined "household purposes." However, because elsewhere in the District of Columbia Code "household goods" were defined to include furniture, furnishings and personal effects used by the depositor in the dwelling, the court concluded that roofing materials were not furniture, furnishings or personal effects, and thus not consumer goods. (*Id.,* at p. 351.)

Similarly, in *Tambur's, Inc. v. Hiltner* (1997) 55 Ohio App.2d 90 [379 N.E. 2d 231] (hereinafter *Tambur's*), the Ohio Sixth District Court of Appeal was required to decide whether aluminum siding fell within the requirements of an Ohio statute regulating homes sales practices. The court concluded that the aluminum siding was not purchased primarily for personal, family or household purposes. It was a building material, which, like a new roof or window sash, becomes part of the realty (a fixture) (*Id.* at p. 234.)

Elk asserts that both these cases are illustrative of the analysis this court should apply to find that the roofing shingles sold by them are not consumer goods.

Atkinson argues that *Potomac* is inapposite because the provision of the District of Columbia Code upon which the court relied has no parallel in

---

[13]The plaintiff alleged that the roofs began leaking water after only three years, and that the coatings on both roofs deteriorated, cracked, and failed to provide the protection described in QSC's data sheet. (*Potomac, supra,* 868 F.Supp. at p. 349.)

California law. Furthermore, the Ohio Second District Court of Appeal has declined to follow *Tambur*'s reasoning as applied to roofing materials.[14]

Contrary to Atkinson's assertion, California's Uniform Commercial Code section 7209, subdivision (3)(b) states in pertinent part: " 'Household goods' means furniture, furnishings and personal effects used by the depositor in a dwelling." We are not convinced, however, that equating "household purposes" with "household goods" disposes of the issue in this case.

Our colleagues in the Fourth District Court of Appeal were faced with a similar challenge in regard to whether Song-Beverly applied to a motor home coach. We quote from their extensive analysis of the history of Civil Code section 1791.

"Under the [Song-Beverly] Act, as originally enacted in 1970, 'consumer goods' were defined as 'any motor vehicle, machine, appliance, or like product that is used or bought for use primarily for personal, family, or household purposes.' (Stats. 1970, ch. 1333, § 1, p. 2478.) This definition appeared in section 1791, subdivision (a).

"In 1971, the Legislature amended section 1791, subdivision (a), to read: ' "Consumer goods" means any new mobilehome, motor vehicle, machine, appliance, like product, or part thereof that is used or bought for use primarily for personal, family or household purposes. "Consumer goods" also means any new good or product, except for soft goods and consumables, the retail sale of which is accompanied by an express warranty to the retail buyer thereof and such product is used or bought for use primarily for personal, family, or household purposes. . . .' (Stats. 1971, ch. 1523, § 2, p. 3001.)

"In 1978, the Legislature amended section 1791, subdivision (a), to read: ' "Consumer goods" means any new product or part thereof that is used or bought for use primarily for personal, family, or household purposes, except for clothing and consumables.' (Stats. 1978, ch. 991, § 1, p. 3058.)" (*National R.V., Inc. v. Foreman, supra,* 34 Cal.App.4th 1072, 1082, fn. 11 (hereinafter *National*).)

---

[14]In *R. Bauer & Sons Roofing v. Kinderman* (1992) 83 Ohio App.3d 53 [613 N.E.2d 1083] (hereinafter *Bauer*), the Ohio Second District Court of Appeal noted that the Ohio statute that regulated home solicitation sales defined consumer goods as goods purchased, leased, or rented primarily for personal, family, or household purposes without further amplification. The definition, however, excluded a specific list of things from that definition. Thus, the court concluded that had the Legislature wished to exclude from the definition those types of goods that required installation or became affixed to the consumer's household, it would have done so within the enumerated exceptions. (*Bauer, supra,* 613 N.E.2d 1083, 1087.)

The *National* court concluded, "[t]he 1978 amendment to section 1791, subdivision (a), served to enlarge the definition of 'consumer goods' from an exclusive list of specific products and their like to an all-inclusive list, including 'any new product . . . except clothing and consumables.' (Stats. 1978, ch. 991, § 1, p. 3058.) This expansion of the definition of 'consumer goods' is reflected in the following legislative committee analysis of the bill that carried the amendment (Assem. Bill No. 3374): 'The products that fall under the regulations of the Song-Beverly Act are those products defined as "consumer goods." The present definition is restricted to predominantly mechanical type products and excludes such goods as furniture, phonograph records, tapes, picture frames and drapes. Due to the manner in which clothing and consumables are handled, it makes some sense to exempt such goods. Beyond that, the question must be raised as to why *any* good should be excluded; should not all products sold be required to perform in the manner intended? The definition of "consumer goods" proposed by this piece of legislation would include all goods except clothing and consumables.' (Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assem. Bill No. 3374 (1977-1978 Reg. Sess.) p. 2, italics in original.) 'Statements in legislative committee reports concerning the statutory objects and purposes which are in accord with a reasonable interpretation of the statute are legitimate aids in determining legislative intent.' (*Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149].)" (*National, supra,* 34 Cal.App.4th at p.1082-1083.)

Atkinson argues, " '[i]n enacting the Song-Beverly Act and amending it over the years, the Legislature's intent was to eliminate misleading "sales gimmicks," and to ameliorate consumer frustration caused by inability to obtain promised repair services. The Song-Beverly Act *"is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to brings its benefits into action."* [Citations.]' (*Reveles* v. *Toyota by the Bay* (1997) 57 Cal.App.4th 1139, 1157-1158 [67 Cal.Rptr.2d 543, 82 A.L.R.5th 781].) 'If a manufacturer elects to provide an express warranty for consumer goods. . . , the Act protects buyers in a number of ways.' (*Jensen* v. *BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 121 [41 Cal.Rptr.2d 295].)" (Boldface added.)

We agree that Song-Beverly "should be given a construction calculated to bring its benefits into action." (*Reveles* v. *Toyota by the Bay, supra,* 57 Cal.App.4th at p. 1158, disapproved on other grounds in *Snukal* v. *Flightways Mfg., Inc.* (2000) 23 Cal.4th 754 [98 Cal.Rptr.2d 1, 3 P.3d 286].) However, we are mindful that we do not construe statutes in isolation. Rather, we "should construe every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and

retain effectiveness." (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].)

 Elk argues that a reading of Song-Beverly demonstrates that the "statute simply does not contemplate building materials, such as roofing shingles, in the context of a completed product, such as a roofing system, under the facts and circumstances of this case. [A] reading of Song-Beverly as a whole and the remedy portions in particular demonstrate that the roofing shingles at issue here simply do not fit into the scheme contemplated by the legislature when it enacted this consumer protection statute."

We find merit in Elk's argument. Civil Code section 1793.2 provides in pertinent part: "(a) Every manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty shall: [¶] (1)(A) Maintain in this state sufficient service and repair facilities reasonably close to all areas where its consumer goods are sold to carry out the terms of those warranties or designate and authorize in this state as service and repair facilities independent repair or service facilities reasonably close to all areas where its consumer goods are sold to carry out the terms of the warranties. [¶] (B) As a means of complying with this paragraph, a manufacturer may enter into warranty service contracts with independent service and repair facilities. The warranty service contracts may provide for a fixed schedule of rates to be charged for warranty service or warranty repair work. However, the rates fixed by those contracts shall be in conformity with the requirements of subdivision (c) of Section 1793.3. The rates established pursuant to subdivision (c) of Section 1793.3, between the manufacturer and the independent service and repair facility, shall not preclude a good faith discount which is reasonably related to reduced credit and general overhead cost factors arising from the manufacturer's payment of warranty charges direct to the independent service and repair facility. The warranty service contracts authorized by this paragraph shall not be executed to cover a period of time in excess of one year, and may be renewed only by a separate, new contract or letter of agreement between the manufacturer and the independent service and repair facility. [¶] (2) In the event of a failure to comply with paragraph (1) of this subdivision, be subject to Section 1793.5.[15] [¶] (3) Make available to authorized service and repair facilities sufficient service literature and replacement parts to effect repairs during the

---

[15]Civil Code section 1793.5 states in pertinent part: "Every manufacturer making express warranties who does not provide service and repair facilities within this state pursuant to subdivision (a) of Section 1793.2 shall be liable as prescribed in this section to every retail seller of such manufacturer's goods who incurs obligations in giving effect to the express warranties that accompany such manufacturer's consumer goods. The amount of such liability shall be determined as follows: [¶] (a) In the event of replacement, in an amount equal to the actual cost to the retail seller of the replaced goods, and cost of transporting the goods, if such

express warranty period. [¶] (b) Where those service and repair facilities are maintained in this state and service or repair of the goods is necessary because they do not conform with the applicable express warranties, service and repair shall be commenced within a reasonable time by the manufacturer or its representative in this state. Unless the buyer agrees in writing to the contrary, the goods shall be serviced or repaired so as to conform to the applicable warranties within 30 days. Delay caused by conditions beyond the control of the manufacturer or his representatives shall serve to extend this 30-day requirement. Where delay arises, conforming goods shall be tendered as soon as possible following termination of the condition giving rise to the delay. [¶] (c) The buyer shall deliver nonconforming goods to the manufacturer's service and repair facility within this state, unless, due to reasons of size and weight, or method of attachment, or method of installation, or nature of the nonconformity, delivery cannot reasonably be accomplished. If the buyer cannot return the nonconforming goods for any of these reasons, he or she shall notify the manufacturer or its nearest service and repair facility within the state. Written notice of nonconformity to the manufacturer or its service and repair facility shall constitute return of the goods for purposes of this section. Upon receipt of that notice of nonconformity, the manufacturer shall, at its option, service or repair the goods at the buyer's residence, or pick up the goods for service and repair, or arrange for transporting the goods to its service and repair facility. All reasonable costs of transporting the goods when a buyer cannot return them for any of the above reasons shall be at the manufacturer's expense. The reasonable costs of transporting nonconforming goods after delivery to the service and repair facility until return of the goods to the buyer shall be at the manufacturer's expense. [¶] (d)(1) Except as provided in paragraph (2), if the manufacturer or its representative in this state does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable tò use by the buyer prior to the discovery of the nonconformity."

Thus, if the goods cannot be returned to the manufacturer because of the method of attachment, the manufacturer has three options. The goods can be serviced or repaired at the buyer's residence, or they can be picked up for

costs are incurred plus a reasonable handling charge. [¶] (b) In the event of service and repair, in an amount equal to that which would be received by the retail seller for like service rendered to retail consumers who are not entitled to warranty protection, including actual and reasonable costs of the service and repair and the cost of transporting the goods, if such costs are incurred, plus a reasonable profit. [¶] (c) In the event of reimbursement under subdivision (a) of Section 1793.3, in an amount equal to that reimbursed to the buyer, plus a reasonable handling charge."

service and repair, or the manufacturer can arrange for transporting the goods to its service and repair facility.

■ Our final step in statutory construction " 'is to apply reason, practicality and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], in accord with common sense and justice, and to avoid an absurd result [citations].' [Citation]" (*Jensen v. BMW of North America, Inc., supra,* 35 Cal.App.4th 112, at p. 123.)

■ The fact that the manufacturer has three options from which he may choose implies that the goods are at least removable from their location without causing further damage. Roofing shingles that are attached to the roof of a structure are not removable, inasmuch as their removal from the roof would cause more damage to them and possibly the roof. Furthermore, we doubt whether roofing shingles can be "serviced" or "repaired" without impairing the visual appeal of the shingles, something that would leave them defective.[16]

Accordingly, we hold that roof shingles are not consumer goods.[17] Thus, Atkinson was not a buyer of consumer goods within the meaning of Song-Beverly.[18] Consequently, Atkinson would not have withstood a motion for nonsuit after opening statement as to the Song-Beverly causes of action.

---

[16]We believe that the purpose of roof shingles is not only to keep out the weather, but also make a house visually appealing.

[17]We are sympathetic to Atkinson's cause and believe that his case is of the type that Song-Beverly was designed to cover. That being said, however, building materials do not appear to fit within the Song-Beverly statutory scheme. Thus, we urge the Legislature to directly address the issue of whether building materials that are incorporated into realty are consumer goods within the meaning of Song-Beverly.

[18]Atkinson argues that roof shingles are consumer goods within the meaning of Magnuson-Moss. Magnuson-Moss defines a "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed.)" (15 U.S.C. § 2301(1).)

Magnuson-Moss is interpreted in 16 Code of Federal Regulations part 700.1 (2003), which provides in pertinent part: "(a) The Act applies to written warranties on tangible personal property which is normally used for personal, family, or household purposes. This definition includes property which is intended to be attached to or installed in any real property without regard to whether it is so attached or installed. This means that a product is a 'consumer product' if the use of that type of product is not uncommon. The percentage of sales or the use to which a product is put by any individual buyer is not determinative. For example, products such as automobiles and typewriters which are used for both personal and commercial purposes come within the definition of consumer product. Where it is unclear whether a particular product is covered under the definition of consumer product, any ambiguity will be resolved in favor of coverage. [¶] . . . [¶] (c) The definition of 'Consumer product' limits the applicability of the Act to personal property, 'including any such property intended to be

Therefore, he cannot show that he was prejudiced by the grant of nonsuit on the court's own motion.

Since we have concluded that Atkinson was not a buyer of consumer goods within the meaning of Song-Beverly we need not address Atkinson's second and fourth contentions as they directly relate to actions under Song-Beverly.

---

attached to or installed in any real property without regard to whether it is so attached or installed.' This provision brings under the Act separate items of equipment attached to real property, such as air conditioners, furnaces, and water heaters. [¶] (d) The coverage of separate items of equipment attached to real property includes, but is not limited to, appliances and other thermal, mechanical, and electrical equipment. (It does not extend to the wiring, plumbing, ducts, and other items which are integral component parts of the structure.) State law would classify many such products as fixtures to, and therefore a part of, realty. The statutory definition is designed to bring such products under the Act regardless of whether they may be considered fixtures under state law. [¶] (e) The coverage of building materials which are not separate items of equipment is based on the nature of the purchase transaction. An analysis of the transaction will determine whether the goods are real or personal property. The numerous products which go into the construction of a consumer dwelling are all consumer products when sold 'over the counter,' as by hardware and building supply retailers. This is also true where a consumer contracts for the purchase of such materials in connection with the improvement, repair, or modification of a home (for example, paneling, dropped ceilings, siding, roofing, storm windows, remodeling). However, where such products are at the time of sale integrated into the structure of a dwelling they are not consumer products as they cannot be practically distinguished from realty. Thus, for example, the beams, wallboard, wiring, plumbing, windows, roofing, and other structural components of a dwelling are not consumer products when they are sold as part of real estate covered by a written warranty. [¶] (f) In the case where a consumer contracts with a builder to construct a home, a substantial addition to a home, or other realty (such as a garage or an in- ground swimming pool) the building materials to be used are not consumer products. Although the materials are separately identifiable at the time the contract is made, it is the intention of the parties to contract for the construction of realty which will integrate the component materials. Of course, as noted above, any separate items of equipment to be attached to such realty are consumer products under the Act."

Title 15 United States Code section 2304 states in pertinent part: "(a)(4) if the product (or component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be). . . . [¶] (b) . . . [¶] . . . (2) . . . [A] warrantor may require, as a condition to replacement of, or refund for, any consumer product under subsection (a) of this section, that such consumer product shall be made available to the warrantor free and clear of liens and other encumbrances, except as otherwise provided by rule or order of the Commission in cases in which such a requirement would not be practicable."

We do not disagree that under certain circumstances roof shingles are consumer products under Magnuson-Moss. However, unlike Song-Beverly, Magnuson-Moss is silent on the requirements it imposes on the warrantor with regard to how the warrantor must act when a consumer cannot return defective goods to the warrantor.

Thus, the way in which a manufacturer can fulfill its obligation under Magnuson-Moss is not the same as under Song-Beverly.

*The Trial Court Erred in Denying Atkinson's Motion to Amend the
Complaint and Continue Trial[19]*

As noted above Atkinson filed his complaint on September 22, 1999. Subsequently, the trial court scheduled the matter for trial to commence on May 7, 2001.

On March 28, 2001, the trial court granted Elk's motion for summary adjudication as to the third cause of action in the complaint for violation of the Consumer Legal Remedies Act. The court ruled that Elk had made no promise that the shingles would be free of defects. Instead, Elk promised only to accept responsibility under the terms of its written 30-year limited warranty if defects occurred in its product.

On April 25, 2001, Atkinson brought an ex parte motion for an order shortening time to file a first amended complaint, and to continue trial. Atkinson sought to amend the complaint by adding four new causes of action: proposed third and fourth causes of action alleging breach of written warranty and breach of implied warranty under Magnuson-Moss (15 U.S.C. § 2301 et seq.); a proposed fifth cause of action alleging fraud by concealment and intentional misrepresentation; and a proposed sixth cause of action based upon an alleged violation of the Unfair Practices Act. (Bus. & Prof. Code, § 17000 et seq.)

The trial court set the hearing for May 4, 2001, the Friday prior to the Monday, May 7 trial date. Elk opposed the motion to amend and continue the trial.

On May 4, 2001 the trial court heard and denied Atkinson's motions.

 Atkinson argues that the trial court erred in denying his motion to amend the complaint and continue the trial.

When a trial court denies leave to amend, the decision has been upheld on grounds such as the fact that the amendment contained objectionable subject matter or because of the conduct of the moving party or belated presentation of the amendment. (See *Dos Pueblos Ranch & Imp. Co. v. Ellis* (1937) 8 Cal.2d 617, 622 [67 P.2d 340]; *Ross v. McDougal* (1939) 31 Cal.App.2d 114, 121 [87 P.2d 709].)

---

[19]Since we have determined that Atkinson did not have any causes of action under Song-Beverly, we only address the issue of whether the trial court erred in denying him leave to amend to state causes of action under Magnuson-Moss, for common law fraud, and violation of the Unfair Practices Act.

Section 473, subdivision (a)(1) states in pertinent part: "[t]he court may . . . , in its discretion after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars . . . ." "This statutory provision giving the courts the power to permit amendments in furtherance of justice has received a very liberal interpretation by the courts of this state. [Citations.]" (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19 [108 P.2d 906, 135 A.L.R. 318].) "This position is clearly in accord with the modern theories of code pleading, which would permit amendment in the discretion of the court unless an attempt is made to present an entirely different set of facts by way of the amendment. [Citation.]" (*Ibid.*)

Elk asserts that by attempting to amend the complaint to allege causes of action under Magnuson-Moss, causes of action for common law fraud and misrepresentation, and unfair business practices, Atkinson "was simply trying to circumvent the trial court's clear ruling" on summary adjudication that as a matter of law there had been no misrepresentations by Elk that its roof shingles were defect free. "Further, the 'new' causes of action were simply a retooling of the allegations which formed the basis for the former third cause of action based on a violation of the Consumer[s] Legal Remedies Act and upon which summary adjudication was granted to [Elk] on March 28, 2001."[20]

Assuming without deciding that Elk's assertion is true, we believe that the better course of action would have been to allow Atkinson to amend the complaint and then let the parties test its legal sufficiency in other appropriate proceedings.[21] (*Kittredge Sports Co. v. Superior Court* (1989) 213 Cal.App.3d 1045, 1048 [261 Cal.Rptr. 857].)

---

[20]In denying Atkinson's motion to file a first amended complaint, the court gave a tentative ruling as follows: "It's my tentative intention to deny both motions. It appears to me, given the circumstances of this case, the history of the case, that there was sufficient information available to the plaintiffs, at least back last fall, to trigger the requested modification—and I'm referring to basically the common law fraud cause of action. [¶] The other causes of action, I didn't go through it line by line, but it appeared that they have been adjudicated by Judge McAdams anyway."

In granting summary adjudication in favor of Elk on the cause of action for violation of the Consumers Legal Remedies Act, Judge McAdams ruled as follows: "Here's the way that I phrased it. There was no promise made that plaintiff's shingles would be free of defects. There's only the promise to accept responsibility if the product turns out to have defects. That's an important distinction in this area . . . ."

[21]The essence of Elk's argument is that in order for Atkinson to recover on any of the proposed alternate theories of recovery there must have been a misrepresentation. Since the trial court found as a matter of law that there had been no misrepresentation, the four proposed causes of action could not have been proven.

We believe that this is a mischaracterization of Judge McAdams's finding. In fact, Judge McAdams chose his words carefully stating, "there was no promise made to the plaintiff that

■ "Although courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial [citations], this policy should be applied only '[w]here no prejudice is shown to the adverse party. . . .' [Citation.]" (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 487 [48 Cal.App.4th 471, 55 Cal.Rptr.2d 225].)

■ Here Elk has not claimed that it will be prejudiced by this amendment. "[I]t is an abuse of discretion to deny leave to amend where the opposing party was not misled or prejudiced by the amendment." (*Kittredge Sports Co. v. Superior Court, supra,* 213 Cal.App.3d at p. 1048 (*Kittredge*); *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564 [176 Cal.Rptr. 704], [where no prejudice is shown to the adverse party, the liberal rule of allowance prevails].) Furthermore, "it is irrelevant that new legal theories are introduced as long as the proposed amendments 'relate to the same general set of facts.' [Citation.]" (*Kittredge, supra,* 213 Cal.App.3d at p. 1048.)

### Disposition

The judgment is reversed. The matter is remanded to the trial court with instructions to grant Atkinson leave to amend the complaint consistent with this opinion. Each party to bear its own costs on appeal.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied July 9, 2003, and appellant's petition for review by the Supreme Court was denied October 1, 2003. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.

---

the shingles were free of defects, only the promise to accept responsibility in the manner described in the warranty if defects occurred."

Thus, as Judge McAdams indicated there were triable issues as to breach of the express warranty and breach of the implied warranty. Consequently, he allowed Atkinson to go forward on the causes of action under Song-Beverly. The same reasoning applies with respect to the Atkinson's proposed causes of action. For example under Magnuson-Moss a consumer who is damaged by the failure of a supplier to comply with an obligation under the act or under a written warranty, implied warranty, or service contract, may bring a suit for damages and other legal and equitable relief. (15 U.S.C. § 2310(d)(1).) A warranty is defined not only as a promise that the consumer product is defect-free or will meet a specified level of performance over a specified period of time, but also as an undertaking in writing to refund, repair, replace, or take other remedial action with respect to such product. (15 U.S.C. § 2301(6).) This is not affected by Judge McAdams's finding.